# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 17-3444-GW-AFMx | Date | November 17, 2020 |
|---|---|---|---|
| Title | *Mariah Danielle Alhawarin v. James McCament, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:    IN CHAMBERS - ORDER**

        Attached hereto is the Court's Tentative Ruling on Cross-Motions for Summary Judgment [142][143]. The Court sets a hearing on the motions for November 19, 2020 at 8:30 a.m. The parties are to appear telephonically by contacting the court clerk at javier_gonzalez@cacd.uscourts.gov.

|  | : |  |
|---|---|---|
| Initials of Preparer | JG | |

_**Mariah Danielle Alhawarin v. James McCament et al**_; Case No. 2:17-cv-03444-GW-(AFMx)
Tentative Ruling on Cross-motions for Summary Judgment

## I.      Background

Plaintiffs Mohammed Alhawarin ("Mr. Alhawarin") and his wife, Mariah Danielle Alhawarin ("Mrs. Alhawarin") (collectively, "Plaintiffs"), bring this immigration case under the Administrative Procedure Act ("APA").   Plaintiffs challenge the decision of United States Citizenship and Immigration Services ("USCIS") – and subsequent affirmation by the Board of Immigration Appeals ("BIA") (collectively, the "Agencies") – to deny Mrs. Alhawarin's Form I-130, Petition for Alien Relative, filed on behalf of her husband which is an initial step to adjust his status to a permanent resident.[1]   At issue is whether Mr. Alhawarin's prior marriage to Amber Williams ("Williams") was a fraudulent one entered into for the purpose of evading immigration laws.   USCIS determined that it was, and that Mr. Alhawarin was therefore statutorily ineligible for a grant of the I-130 petition.   Before the Court are the parties' cross-motions for summary judgment.[2]

A.  Legal Background

When a U.S. citizen marries a non-citizen, the former may petition for lawful permanent residency for the latter.   _See_ 8 U.S.C. §§ 1151, 1154.   The process begins with the citizen filing a Form I-130, which asks USCIS to formally recognize the validity of the marriage. 8 C.F.R. §§ 204.1(a)(1), 204.2(a)(1).   The petitioner bears the burden of providing evidence of the claimed relationship.  8 C.F.R. §§ 204.1(a)(2).   USCIS then conducts "an investigation of the facts" and adjudicates the petition. 8 U.S.C. § 1154(b).   Once the I-130 petition is approved, the non-citizen

---

[1] The Department of Homeland Security ("DHS") administers and enforces the immigration laws.  8 U.S.C. § 1103(a)(1).   Within the DHS are the United States Citizenship and Immigration Services ("USCIS") which is charged with processing immigration and naturalization applications (such as I-130 petitions), and the United States Immigration and Customs Enforcement ("ICE") which is charged with enforcing immigration laws including initiation of investigations into potential violations.

[2] The following abbreviations are used for the parties' filings: (1) First Amended Complaint ("FAC"), ECF No. 64; (2) Certified Administrative Record ("CAR"), ECF No. 81; (3) Defendants' Motion for Summary Judgment ("Def. MSJ"), ECF No. 142; (4) Plaintiff's Motion for Summary Judgment ("Alhawarin MSJ"), ECF No. 143; (5) Transcripts from bond hearings in Mr. Alhawarin's Removal Proceedings ("Bond/Removal Tr."), ECF No. 143-3; (6) Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp."), ECF No. 145; (7) Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Alhawarin Opp."), ECF No. 147; (8) Defendants' Reply in Support of its Motion for Summary Judgment ("Def. Reply"), ECF No. 149; (9) Plaintiffs' Reply in Support of its Motion for Summary Judgment ("Alhawarin Reply"), ECF No. 150; (10) Defendants' Statement of Uncontroverted Facts ("Def. SUF"), ECF No. 149-1; (11) Plaintiffs' Statement of Uncontroverted Facts ("Alhawarin SUF"), ECF No. 150-1.

spouse may thereafter apply for permanent residency.  *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 245(a).[3]

However, statutory law provides that "no petition shall be approved" if USCIS determines that the non-citizen spouse previously entered into a marriage "for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c).  "This is a severe penalty in several ways." *Zerezghi v. U.S. Citizenship and Immigration Services*, 955 F.3d 802, 804 (9th Cir. 2020).  First, it applies even if the current marriage is bona fide. *Id.*  Second, it is a mandatory bar. *Id.*; *see also* 8 U.S.C. § 1154(b).

The regulations require that USCIS "deny a petition for immigrant visa classification filed on behalf of any alien for whom there is *substantial and probative evidence*" of an attempt or conspiracy "to enter into a marriage for the purpose of evading the immigration laws."  8 C.F.R. § 204.2(a)(1)(ii) (emphasis added).  Where the USCIS denies an otherwise valid I-130 spouse petition on the grounds that the alien beneficiary had previous been involved in marriage fraud, the initial burden of proof is on USCIS which, *inter alia*, often uses documents in its possession, interviews with the couple, and observations made during visits to the couple's marital residence. *See Zerezghi*, 955 F.3d at 805 (citing *Matter of Singh*, 27 I & N Dec. 598, 600-01 (BIA 2019)).  If USCIS finds that there is "substantial and probative evidence" of marriage fraud, it issues a Notice of Intent to Deny the immigration petition.  The burden then shifts to the petitioner to rebut that finding. *Matter of Kahy*, 19 I. & N. Dec. 803, 806-07 (BIA 1988).  If the petitioner cannot rebut the charge to USCIS' satisfaction, the petition is denied.

B. Factual Background[4]

Mr. Alhawarin, a stateless Palestinian, was born in Hebron, Israel.  Def. SUF ¶ 2, FAC ¶ 27.  He entered the United States in 2005 on an F-1 student visa.  FAC ¶ 28.  Mr. Alhawarin met his first wife (*i.e.* Williams, a U.S. citizen) in April 2008, while they were both working at a Cold Stone Creamery shop in Dover, Delaware owned by Mr. Alhawarin's brother, Murad Alhawarin ("Murad").  Def. SUF ¶ 3; FAC ¶ 30.  Murad originally proposed the idea of Williams and Mr

---

[3] The grant of the I-130 petition does not grant lawful permanent resident status.  The alien beneficiary must thereafter apply for adjustment of status.  As described in *Lee v. Barr*, 975 F.3d 69, 73 (1st Cir. 2020), "an I-130 petition [is] a visa petition that a U.S. citizen or legal permanent resident may file on behalf of an alien relative as the first step in that relative's application for a green card through adjustment of status."  Furthermore, as stated in the instructions to the I-130 Petition for Alien Relative Form itself, "The filing or approval of this petition does not give your relative any immigration status or benefit."  *See https://www.uscis.gov/i-130* (last visited November 13, 2020).

[4] The following facts, unless otherwise noted, are not disputed; or, if disputed, the disputing party has failed to proffer any evidence (such as reference to the Certified Administrative Record) to establish a valid basis for a disagreement as to the fact.

Alhawarin getting married.  *See* Plaintiffs' Response to Def. SUF ¶ 3.  The two of them were married five months later by a justice of the peace with only Mr. Alhawarin's cousin present.[5]  Def. SUF ¶ 4.  After the marriage, the two found an apartment in Dover, Delaware in December 2008 with a third roommate, Jonica Webb ("Webb").  Def. SUF ¶ 31; CAR at 514.  On December 4, 2008, Williams filed an I-130 petition on behalf of Mr. Alhawarin.[6]  *Id.* ¶ 7, *see also* CAR at 507.  The two were interviewed by a USCIS officer in May 2009 as part of the petition process.  *Id.* ¶ 9.  The officer noted some discrepancies in the answers they gave.  For example, the officer's notes indicate that when asked what time Mr. Alhawarin returned home on the Friday before the interview, Mr. Alhawarin said it was around 5:00 PM, whereas Williams "emphatically" stated that Mr. Alhawarin never came home before 11:00 PM.  *Id.* ¶ 11, CAR at 517.  When asked whether Mr. Alhawarin had ever been away from their home for a two-week period, the officer wrote that Williams "emphatically said the opposite" of what Mr. Alhawarin had told the officer (that he had not).  CAR at 519.  Furthermore, the officer observed that Mr. Alhawarin's answer to one question (asking when was the last time he went shopping with Williams) was "very evasive – [Mr. Alhawarin] stated that he has panic attacks and has trouble remembering things."  CAR at 518.

Because of these discrepancies, USCIS requested that U.S. Immigration and Customs Enforcement ("ICE") investigate Mr. Alhawarin and Williams for marriage fraud.  The marriage fraud investigation was conducted by officers from both the DHS and the Federal Bureau of Investigation ("FBI").[7]  Alhawarin SUF No. 10.  Williams was interviewed by ICE officer Mark Olexa in June 17, 2010.  Def. SUF ¶ 13.  At the interview, Williams hand wrote a statement on a Form I-215W: Record of Sworn Statement in Affidavit Form (the "June 2010 Statement") admitting that the marriage was a fraud.  Def. SUF ¶ 14.  In it, Williams described how Murad

---

[5] Williams contends in a December 2010 statement that, after their marriage ceremony, she and Mr. Alhawarin went to a "Bob Evans" restaurant with friends.  CAR at 50.  She also states that: (1) at the time of her marriage, she was living with her grandmother; (2) immediately after the marriage, she continued to live with her grandmother for a period of time; and (3) during that time, she never told her grandmother that she had married Mr. Alhawarin.  *Id.*

[6] Williams' I-130 petition was prepared by an attorney (*i.e.* John Vandenberg).  CAR at 526.

[7] In 2003, the Attorney General delegated authority to FBI agents "to exercise the functions of immigration officers for the purpose of (1) investigating . . . any alien who is in the United States in violation of the Immigration and Nationality Act of 1952, as amended, or any other law or regulation relating to visa or the conditions of visas, admission of aliens . . . or (2) enforcing any requirements of such statutes or regulations . . . ."  *See* FBI, Office of General Counsel, Delegation of Authority to the FBI to Exercise the Powers and Duties of Immigration Officers, (Feb. 26, 2003) published in AILA InfoNet at Doc. No. 01300915.

pressured her into marrying Mr. Alhawarin "as soon as possible" and helped her and Mr. Alhawarin prepare for the May 2009 interview.  CAR at 511.  Murad met with the couple two days before the interview to take pictures of them to supplement their I-130 petition and Mr. Alhawarin filed a joint tax return for himself and Williams – after Williams had already filed her tax return individually.[8]  CAR at 511.  Williams stated that Mr. Alhawarin "never really lived in [the Dover apartment] with me" and that, by October 2009 (when the lease was about to expire and Mr. Alhawarin had refused to let her move in with him), she had left the apartment to live with her grandmother and was seeking a divorce.  CAR at 511.  Williams believed that her marriage had been a fraudulent one observing that:

> In February 2009, Mohammed clearly told me he needed a green card to remain in this country.  He told me he would help me if I helped him, but by then I realized the marriage was false and he was only tied to me for his green card . . . .
> * * * *
> In October 2009 me and Mohammed met up and talked about the marriage and I told him I didn't want to be a part of it.  I wanted a divorce . . . . [He] basically then stated he just needed a green card because he wanted to go to school and it would be cheaper for him if he was a U.S. citizen.  He said the marriage was false later on a couple weeks later and he just wanted a green card and I could go on and live my life after he got his card.  He took me back home and told me it wouldn't be right if I divorced him after he paid out all the money he paid for the rent for the apartment.

CAR at 511.  In her hand-written statement, Williams affirmed that she was told by the officer that her "statements must be made freely and voluntarily."[9]  CAR at 510.

Williams signed a form dated June 17, 2010, "voluntarily" withdrawing her I-130 petition. CAR at 509.  On December 3, 2010, the USCIS acknowledged the withdrawal but stated that: (1) Williams and Mr. Alhawarin had "failed to produce sufficient documentary evidence to demonstrate the bona fide nature of [their] relationship;" (2) significant discrepancies appeared in Williams' and the beneficiary's individual responses before the USCIS officer; (3) Williams had "provided a sworn statement that included an admission that [she] and the beneficiary engaged in

---

[8] In her June 2010 Statement, Williams also related that:

On May 14, 2009, me and Mohammed went to PA to see the lawyer before the actual interview . . . . The lawyer asked us numerous questions to get us prepared for the immigration lawyers.  We were held in separate rooms and after we came back together, the lawyer noted everything we said wasn't legit and it was bullshit.

CAR at 511.

[9] The June 2010 Statement indicates that Williams' signing of the document and swearing to the truth of its contents was also witnessed by another government officer.  CAR at 513.

a fraudulent martial arrangement;" (4) the USCIS had found that statement to be "detailed and credible;" (5) the USCIS found Williams' withdrawal of her I-130 petition to be "freely and voluntarily" made; (6) "[i]n view of the fact that [she] requested that the subject petition be withdrawn, USCIS will address that request rather than proceed with adjudication of [her] petition;" (7) [her] "withdrawal is acknowledged and effective as of this date;" (8) "[a]s set forth in 8 CFR § 103.2(b)(l5), no appeal lies from USCIS' acknowledgement of withdrawal;"[10] and (9) the "withdrawal terminates any further action on [her] petition."  CAR at 440-41; Def. SUF ¶ 34. Despite being informed that no appeal lies from a USCIS acknowledgement of a withdrawal of a I-130 petition, on December 17, 2010, Williams filed a Notice of Appeal to the BIA from the USCIS' acknowledgement asserting that she "never knowingly withdrew this case for the . . . Beneifcary [sic] and if there is a withdraw notice signed by her in the file it was only obtained by trickery and coercion."[11]  CAR at 422.  In that Notice of Appeal, in the section for a specification of the reasons for the appeal,[12] Williams stated that "Petitioner through this appeal requests that this case is immediately reopened and a properly factually based decision is entered."  *Id.*  It is unclear from the record if there ever was an adjudication of Williams' appeal from the USCIS' acknowledgement of withdrawal.

On October 25, 2010, USCIS Officer Olexa interviewed Jonica Webb who was Williams' roommate during a portion of the relevant period of time.  Webb provided a hand-written sworn statement on a DHS Form I-263W form declaring in part that:

> I lived at 848 Woodcrest Dr. Apt. C3 for approx. 8 months.  Mike [Mr. Alhawarin] and Amber [Williams] were married and it was fake.  Amber received money, cars, cameras, for the marriage.  Amber and Mike would meet outside the apartment for interviews.  Mike never spent the night or got dressed at the apartment.  Amber said she was helping Mike stay in the U.S.  Amber was not faithful nor did she want to be with Mike.  She just wanted money or material things from him.  Amber said she was scared she was going to get caught and go to jail.

CAR at 514-15.  Webb's swearing to the contents of her statement and her signing it was witnessed

---

[10] As stated in 8 CFR § 103.2(b)(l5): "The USCIS acknowledgement of a withdrawal may not be appealed. A denial due to abandonment may not be appealed, but an applicant or petitioner may file a motion to reopen under § 103.5."

[11] In her appeal, Williams was represented by the same attorney who is the counsel of record for the Plaintiffs herein (*i.e.* Julie A. Goldberg).  CAR at 420, 423.

[12] In the Form EOIR-29 Notice of Appeal, in the Section 2 specification of reasons for appeal, appellants are warned that "If the factual or legal bases for the appeal is not sufficiently described, the appeal may be summarily dismissed."  CAR at 422.

by a second government officer, *i.e.* Walter Markovsky.  CAR at 516.

According to Plaintiffs, the FBI initiated a criminal investigation into Mr. Alhawarin to see if there were grounds for charging him with any crimes.[13]  As part of this investigation, an FBI agent met with Williams on July 9, 2010 and later on July 12, 2010, to conduct consensually recorded phone calls between her and Mr. Alhawarin "to see if he would make any incriminating statements that might be used in a criminal proceeding."  Alhawarin Reply at 13-14.  Mr. Alhawarin ultimately was not prosecuted, though removal proceedings were commenced against him (as described below).

Mr. Alhawarin and Williams divorced in October 2010.  Def. SUF ¶ 33.  Mr. Alhawarin later entered into a second marriage, this time with Mrs. Alhawarin.  The two of them met in January 2009, also while working at Cold Stone Creamery, but at a different location in Delaware.[14]  Mr. Alhawarin and Mrs. Alhawarin obtained a marriage license in November 2010, and were formally married in May 2011; Mrs. Alhawarin filed a Form I-130 petition on his behalf in June 2011.  CAR at 493-95; Def. SUF ¶¶ 36-37.

While those events were transpiring, ICE commenced removal proceedings against Mr. Alhawarin based on his allegedly false marriage to Williams as well as for violating the terms of his F-1 visa.[15]  FAC at 3; Alhawarin Reply at 14.  ICE agents wanted to detain Mr. Alhawarin, and so bond hearings were held before an immigration judge, which ran from December 2010 through May 2011.[16]  At the bond hearings, Plaintiffs provided a sworn declaration from Williams (the "December 2010 Statement") asserting that her marriage to Mr. Alhawarin was bona fide and that her June 2010 Statement was coerced by ICE and FBI officers.[17]  Def. SUF ¶ 43.  Williams states:

> [The ICE and FBI officers] have continually harassed me and would not stop.  They never informed me that I had a right to an attorney or to remain silent and that I didn't not [sic] have to speak to them or go in their car to there [sic] office or let

---

[13] As per 8 U.S.C. § 1325(c), "Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years . . . ."

[14] Mr. and Mrs. Alhawarin started "dating" in the summer of 2010 while Mr. Alhawarin was still married to Williams.  CAR at 501, 521.

[15] If he had engaged in marriage fraud, Mr. Alhawarin was eligible for removal under 8 U.S.C. § 1227(a)(1)(G)(ii).  *See* Def. Opp. at 15.

[16] There were five separate hearings dates, due to repeated continuances.

[17] Williams' December 2010 Statement which was proffered at the bond hearing appears to be the same one that she supplied in her appeal of the USCIS' acknowledgement of withdrawal of her I-130 petition and which was also later filed in Mrs. Alhawarin's I-130 petition and appeal.  *Compare* CAR at 434-39 *with* CAR at 137-42, and *with* CAR 47-52.

them in my house.  They have come to my house several times.  One time they made my grandmother call me when I was staying at a friend's house and when I got on the phone they demanded that they come pick me up.  They made me go in the car to their office and sign many papers I did not understand.  They have given me a list of eight questions and demanded that I call [Mr. Alhawarin] on the phone and ask him exactly what was written and they threatened me that if I didn't read the questions exactly how they wrote them without changing the words I would be arrested and in trouble.

CAR at 48.  The immigration judge ultimately allowed Mr. Alhawarin to post bond.  CAR at 237.  The removal proceedings were eventually administratively closed in 2016 because of the Agencies' long delay in processing Plaintiffs' Form I-130 petition.  Def. Reply at 6, n.3.

USCIS issued to Plaintiffs its Notice of Intent to Deny the I-130 petition in August 2013 ("NOID"), finding that while their marriage appeared to be bona fide, Mr. Alhawarin's previous marriage to Williams was not.[18]  Def. SUF ¶ 41.  Under 8 U.S.C. § 1154(c), Mr. Alhawarin was therefore ineligible for approval of the I-130 petition.  In the NOID, the USCIS advised the Plaintiffs that they could submit additional evidence.  CAR at 10.  Plaintiffs responded by supplementing their petition with new material, including Williams' December 2010 Statement.  Def. SUF ¶ 43.  The Plaintiffs did not supply the USCIS with a transcript or the CD recordings of the bond hearings.  See CAR at 33, 36.  Nor did they make a request to be allowed to conduct an examination of Webb.  See Def. SUF ¶ 43.

USCIS denied the petition in September 2014.  Def. SUF ¶ 44.  Plaintiffs immediately appealed to the BIA.  However, their appeal languished for over two years because USCIS failed to forward it to the BIA.  Finally, after the filing of a federal lawsuit in this district seeking a writ of mandamus to compel USCIS action, their appeal was sent to the BIA.  FAC ¶ 87.  The BIA affirmed USCIS' denial.  Def. SUF ¶ 57.

Plaintiffs seek to set aside the Agencies' denial of their petition, challenging it under the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see Alhawarin MSJ at 3.  The defendants are all federal officials (or former federal officials) from the Agencies or other government entities, sued in their official capacities ("Defendants").

---

[18] In the NOID, the USCIS stated that it was basing its decision on, inter alia: (1) Williams' June 2010 Statement (wherein she sworn that her marriage to Mr. Alhawarin was not bona fide), and (2) the information provided by Webb (the roommate during the relevant time) who confirmed that the marriage was fraudulent based on her observations and Williams' admissions to her.  CAR at 9.

## II.     Legal Standard

The review of a final agency action is governed by the APA using a deferential standard, under which an agency's decision may be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The role of the court is not to substitute its judgement for that of the agency.  *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 838, 841 (9th Cir. 2003).  Rather, "[courts] ask whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'"  *Natural Res. Def. Council v. U.S. Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990)).

An agency's factual finding will not be disturbed if it is supported by "substantial evidence."  *Family Inc. v. U.S. Citizenship and Immigration Services*, 469 F.3d 1313, 1315 (9th Cir. 2006).  Under this deferential standard, the decision will be set aside only if the challenging party shows that "the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Under the APA, a district court's review is usually limited to the administrative record.  5 U.S.C. § 706.[19]  Therefore, the usual "genuine dispute of material fact" standard for summary judgment does not apply, as the entire case on review is a question of law.  In APA cases, summary judgment functions as a mechanism for determining as a matter of law whether the administrative record supports the agency's decision and whether the agency complied with the APA.  *Occidental*

---

[19] In general, "judicial review of an agency action is limited to the administrative record on which the agency based the challenged decision," *Fence Creek Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (citation omitted).  However, "certain circumstances may justify expanding review beyond the record or permitting discovery."  *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (citation omitted).  The Ninth Circuit mandates that courts may only review extra-record materials if: "(1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency."  *Fence Creek*, 602 F.3d at 1131; *see also Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450 (quoting *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703-04 (9th Cir. 1996)).  To successfully invoke one or more of these factors, the plaintiff has a "heavy burden to show that the additional materials sought are necessary to adequately review" the agency's decision.  *Fence Creek*, 602 F.3d at 1131.

*Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

**III.   Discussion**

   A.   Whether USCIS and the BIA were Collaterally Estopped from Finding that Mr.
   Alhawarin's Marriage to Williams was not Fraudulent

Plaintiffs argue that Mr. Alhawarin's previous marriage to Williams was already determined by an immigration judge in Mr. Alhawarin's 2010-11 bond hearings to have been bona fide, and that the Agencies were therefore collaterally estopped from finding otherwise.

Collateral estoppel generally applies to agency decisions. *See B & B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 148 (2015) (observing that "where a single issue is before a court and an administrative agency, preclusion also often applies").  The Supreme Court has held that because the principle of issue preclusion was so "well established" at common law, where Congress has authorized agencies to resolve disputes, "courts may take it as given that Congress has legislated with the expectation that the principle [of issue preclusion] will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 108 (1991).  "The general rule is that when an issue of fact is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *B & B Hardware*, 575 U.S. at 148 (citing the Restatement (Second) of Judgments).

Plaintiffs argue that there was a final determination by the immigration judge that Mr. Alhawarin's marriage to Williams was bona fide.  Alhawarin Reply at 12; Alhawarin Opp. at 9-10.  For this contention, Plaintiffs rely on the immigration judge's April 8, 2011 statement that "[t]he government alleges that the marriage is fraudulent, for that reason I need to assess the veracity of the marriage in order to make a determination." *See* transcripts of bond hearings conducted by Immigration Judge Arthur in removal proceedings in *Matter of Mohammed R. Alhawarin*, No. 087153455 ("Bond/Removal Tr.") at 46, attached as Exhibit A to Plaintiffs' Amended Motion for Summary Judgment, ECF No. 143-3.

At bond hearings, immigration judges do not normally issue final rulings on the merits of the alien's case.  Indeed, if they did so, there would be no need for any subsequent proceedings on the matter.  The sole question at an immigration bond hearing is whether the alien merits release on bond during the pendency of the proceedings.  As observed in *In re Guerra*, 24 I&N Dec. 37, 40, 2006 WL 3337627, at *40 (BIA 2006): "In general, an Immigration Judge must consider

9

whether an alien who seeks a change in custody status is a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." Therefore, even if the immigration judge here made some general statement as to the merits of Mr. Alhawarin's case, it would not have been a final and binding ruling. Thus, there is no collateral estoppel bar in the present case.

The immigration judge herein did initially state that it was his impression that the issue of Mr. Alhawarin's marriage to Williams had to be examined during the bond hearing; and, indeed, he allowed a substantial amount of evidence into the hearing which related to that topic. Nevertheless, the immigration judge ultimately changed course and did not make any decision about the validity of the marriage in determining that Mr. Alhawarin would be allowed to post bond. Plaintiffs' counsel, who represented Mr. Alhawarin at the bond hearing, specifically asked the immigration judge on May 3, 2011, "Are you going to make a ruling on the marriage fraud at this point?" to which the judge responded "No, this is the bond." Bond/Removal Tr. at 194. Two weeks later, on the final day of bond hearings, the immigration judge again clarified that "[t]he only issue for this court is whether or not [Mr. Alhawarin is] a high risk, whether or not he is a danger to the community." *Id.* at 230. In the end, the judge did not determine whether Mr. Alhawarin's marriage to Williams was bona fide. Because there was no such final judgment or decision, the Agencies were not collaterally estopped from making their own determination of that issue.

B. Whether the Agencies Considered the Complete Record

Early on in this matter, Plaintiffs argued that the administrative record lodged by USCIS was incomplete. The primary omission that they identified was the absence of the transcripts of Mr. Alhawarin's bond hearings from his removal proceeding in late 2010 and early 2011. *See* Notice of Motion to Compel Full Administrative Record at 1-2 & 5, ECF No. 86. The Court denied the Plaintiffs' motion to compel but allowed limited discovery on the issue. *See* ECF No. 89. Thereafter, the Plaintiffs filed a motion to supplement the administrative record. *See* ECF No. 123. In that motion, Plaintiffs did not supply the Court with actual copies of the items which they claimed should have been placed into the administrative record, including the transcripts of the bond hearings. After considering the arguments of counsel and reviewing the filed materials, the Court denied the motion finding that: (1) "Defendants put forward evidence obtained through discovery, showing that Plaintiff misrepresented the underlying evidence of irregularities in the

certified record and has since made concessions about that evidence;" and (2) Plaintiff has conceded that some of the materials which Plaintiff alleged were missing from the Administrative record were in fact not submitted." *See* ECF No. 129 at 7 of 9. As explained by Government counsel at the May 9, 2019 hearing and accepted by the Court, there never were transcripts made from the recordings of the bond hearings for Mr. Alhawarin's removal proceedings that were provided to the USCIS or the BIA before those agencies made their respective decisions.[20] *See* Reporter's Transcript of May 9, 2019 hearing ("5/9/19 Trans.") at 6, ECF No. 157. While there were CDs from the bond hearings, as further explained by Government counsel:

> The decision of both agencies themselves say that there were no CDs submitted, and as we have proved over the course of discovery, those CDs were never submitted. They are not in the [A-]file now. They are not in the record of proceeding. The USCIS never considered them. The board of immigration appeals never considered them when reviewing that denial, and, as I stated at the last hearing, DOJ counsel as part of this litigation after this lawsuit was filed obtained the CDs as part of preparation for this litigation.
>
> So myself, as counsel for the agency, and agency counsel have now obtained the tapes in 2018, but at the time of this adjudication in I believe 2013, 2014, USCIS did not have these tapes, and no one from the operational agency, the adjudicators of the agency to this date have heard anything on these tapes.
>
> * * * *
>
> It could well be relevant had they been submitted and had the agency considered them during the adjudication. What we are saying and what the affidavit from the adjudicating officer has demonstrated that those CDs were not submitted so they were not considered. So to the extent that the plaintiffs believe the failure to consider them was a problem, that is a merits issue that I imagine we will discuss at length in summary judgment. But the fact of the matter is that we are talking about the certified administrative record right now which is just the things that were considered.

*Id.* at 7, 10.

The Court found that Plaintiffs did not establish that: "(1) USCIS failed to consider all relevant factors and explain its decision; (2) the agency relied on materials outside the administrative record to reach its decision; or (3) USCIS acted in bad faith when rendering its decision and certifying the record before the Court." *See* ECF No. 129 at 7 of 9 (footnote omitted).

---

[20] It should be noted that the recordings of the bond hearings in the removal proceedings would not have been contained in the Mr. Alhawarin's A-file that was before the USCIS or the BIA in regards to the I-130 petition process. As stated in 8 C.F.R. § 1003.19(d), "Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding."

Although it did not grant Plaintiffs' motion to supplement the administrative record, the Court did allow Plaintiffs to supply a copy of the transcripts of the bond proceedings with their summary judgment motion papers for the following reason: "I will include those recordings not as part of the certified administrative record because I agree if they are not considered, they are not part of the certified administrative record, but how would [Plaintiffs' counsel] establish that the failure to include them would be prejudicial to her client[s] unless there is somewhere in a record what those recordings actually are."  *See* 5/9/19 Trans. at 10.

In their present motion for summary judgment, Plaintiffs repeat their argument that the Agencies failed to consider the entire record because they did not consider the testimony at Mr. Alhawarin's bond hearings from 2010-11.   According to Plaintiffs, that testimony included evidence about two crucial aspects of the case: (1) testimony from Williams stating that she was coerced by federal officers into withdrawing her I-130 petition and signing the June 2010 Statement; and (2) testimony from an FBI agent confirming Plaintiffs' allegations that the FBI wanted Mr. Alhawarin and his brother to act as informants in a separate investigation, and that the marriage-fraud investigation was prompted by the FBI's disatisfaction with their level of cooperation.  *See* Alhawarin Opp. at 13-14.

However, the Court has already found that the record was complete and denied Plaintiffs' motion to supplement it.  *See* ECF Nos. 89, 129.  In response to Plaintiffs' identical argument in their motion to supplement, the Court observed that:

> the USCIS decision manages to address much – if not all – of the alleged content of the [m]issing [m]aterials through reference to other declarations from Williams that are included in the certified record; in particular the decision addresses Williams' allegations about harassment and coercion from the FBI and immigration authorities, as well as her statements that her marriage to [Mr.] Alhawarin was not fraudulent.

ECF No. 89 at 9.

As to Plaintiffs' claim that the recordings of the bond hearings were necessary to adjudicate Mrs. Alhawarin's I-130 petition, first – as already noted, *supra* – the Plaintiffs were notified in the August 2013 NOID of the USCIS' intent to deny the petition because it had found Mr. Alawarin's prior marriage to Williams had been fraudulent.  The Plaintiffs were given the opportunity to supplement the record which could have included their submission of the transcripts and/or the CD recordings; but they failed to do so.  Those transcripts/recordings were not in Mr. Alhawarin's A-File (*see* footnote 20, *supra*); so if Plaintiffs believed that they were essential to their case, they

should have provided them to the Agencies as they had done with Williams' December 2010 Statement.

As to Plaintiffs' contentions that the recordings would have proven: (1) that Williams was in fact coerced by the DHS and/or the FBI, and (2) that there was testimony from an FBI agent confirming Plaintiffs' other allegation (that the FBI wanted Mr. Alhawarin and his brother to act as informants in a separate investigation, and that the marriage-fraud investigation was prompted by the FBI's dissatisfaction with their level of cooperation), the recordings fail to establish either proposition.  Addressing the latter contention first, it is noted that at the bond hearings, only the Government called a witness from the FBI, *i.e.* agent Walter Markovsky.  *See* Bond/Removal Tr. at 175-76.  Markovsky testified that "The FBI received information that Mr. Alhawarin may have been involved in marriage fraud, so we initiated an investigation to determine if there were any grounds to charge him with any crimes."[21]  *Id.* at 178.  The FBI worked jointly with the DHS.  *Id.* at 178-79.  Markovsky stated that he was not present when Williams wrote her June 2010 Statement and, to his knowledge, no one made any threats or promises to her to get her to make that statement.  *Id.* at 179- 80.  He first met her on July 9, 2010, after she had already executed the sworn statement.  *Id.* at 180.  Williams never indicated to him that she felt threatened by the governmental agencies.  *Id.* at 181.  Further, Markovsky stated that eventually the U.S. Attorney's Office declined to prosecute Mr. Alhawarin criminally for marriage fraud and, thereafter, ICE (and not at the request of the FBI) elected to put him into removal proceedings.  *Id.* at 183.  He further stated that the FBI did not initiate any interview with Mr. Alhawarin's brother Murad.  *Id.* at 183-84.  Rather, Murad through his attorney (*i.e.* Julie Goldberg) set up the meeting to discuss Murad's being stopped during his travels in and out of the United States.  *Id.* at 183-84.  Murad's brother (Mr. Alhawarin) was not discussed during that meeting.  Contrary to Plaintiffs' representation, Markovsky did not testify that the FBI was ever interested in either Mr. Alhawarin or his brother because it wanted to have them act as informants.  Indeed, in the transcripts, the only person using the word "informant" in regards to the FBI was Plaintiffs' counsel and without any evidence (*e.g.* a declaration or affidavit under oath, or some document) to support her claim.[22]

---

[21] Markovsky also testified that he interviewed Mr. Alhawarin who stated that he never lived at 848 Woodcrest Drive where Williams and Webb were residing when Mr. Alhawarin was supposedly married to Williams.  *Id.* at 181-82.

[22] DHS counsel at the bond hearing did state that: "this suggestion that there is this effort on behalf of the FBI to enlist the respondent's brother and the respondent as informants and their refusal to do so has resulted in his

As to Plaintiffs' argument that the bond hearings established Williams was in fact coerced by government agents into hand-writing her June 2010 Statement, her testimony at best merely echoed the assertions in her December 2010 Statement which was already before the USCIS and the BIA.  Additionally, however, her testimony at the bond hearing actually contains a great degree of material which was harmful to Plaintiffs' case.  For example, when she began her testimony, Williams emphatically stated that she and Mr. Alhawarin *never* lived together.[23]   Likewise, Williams indicated that substantial portions of her June 2010 Statement were in fact correct.  *E.g.* (1) that Murad was the one that first proposed that Mr. Alhawarin and Williams should get married − *compare* CAR at 510 *with* Bond/Removal Tr. at 77-78; (2) that Mr. Alhawarin paid $500 every month for rent (and Webb paid the other $250), he let her drive his car and paid for the insurance − *compare* CAR at 510 *with* Bond/Removal Tr. at 80; (3) that Mr. Alhawarin came to her in February 2009, told her he needed a green card, and told her that he would help her help him − *compare* CAR at 511 *with* Bond/Removal Tr. at 80-81; (4) that, in May 2009, Murad contacted her so that she and Mr. Alhawarin could prepare for the USCIS interview and Murad printed out typical questions that could be asked during that interview − *compare* CAR at 511 *with* Bond/Removal Tr. at 81; (5) that before the interview, she and Mr. Alhawarin met with an immigration lawyer (*i.e.* John Vanderberg) who, after he had asked them both separately a series of questions, said that it was "bullshit" − *compare* CAR at 511 *with* Bond/Removal Tr. at 81-82; *etc*.

---

detention, is absolutely not true."  *See* Bond/Removal Tr. at 228.

[23] When questioned by the immigration judge, Williams stated:

Judge: Alright. And you and your husband lived together?
Amber Williams: No.
Judge: What?
Amber Williams: No.
Judge: Did you live together, I apologize.
Amber Williams: No.
Judge: You've never lived with Mr. – with – never lived with him?
Amber Williams: No.
Judge: And I'm talking about Mr. Alhawarin.
Amber Williams: I understand.
Judge: You've never lived with him.
Amber Williams: No.
Judge: Okay. Because he told me you all did live together at the – 848 Woodcrest Drive, is that correct?  * * * * So, he told me that he'd be there two to three nights a week, is that not correct?
Amber Williams: As far as not – he didn't stay there, but he would come there and just hang out with me or something, in my days off of work.
*See* Bond/Removal Tr. at 72.

As to whether she was actually coerced by government agents into writing falsehoods in her June 2010 Statement, Williams' testimony at the bond hearings was entirely unclear.  While Williams generally made a claim of coercion, when asked more specifically about particular items, her testimony did not show that she wrote them because of a threat or show of force.  For example, when questioned as to why she wrote in her June 2010 Statement that Murad had promised her $1,000 and a new car, Williams stated: "FBI people came to me asking questions and, I felt like they wanted me to answer questions like how they wanted me to answer questions."  *See* Bond/Removal Tr. at 82.  When probed further, the following exchange occurred:

> DHS: I'm asking you did someone direct you to write the words "the night of the interview, Murad told me if everything was successful, he would give me $1,000 and buy me a brand-new car."
>
> Amber Williams: Are you asking me if I put that on paper?
>
> DHS: No, no; no. I'm asking you –
>
> Judge: The question is, did somebody ask you, Ms. Williams, to write that down.
>
> Amber Williams: Yes, they did.
>
> Judge: They told you to write exactly that down.
>
> Amber Williams: Not exactly word per word, but I had – did some pieces of [U/A].
>
> Judge: Okay, did they tell you to write down that Murad offered you $1,000?
>
> Amber Williams: No.
>
> Judge: Okay, so, where did that come from?  That's the part I can't quite figure out.
>
> Amber Williams: I don't know where it came from, I don't recall. I don't remember. This happened so long ago, I don't remember a lot of things.

*See* Bond/Removal Tr. at 82.

Finally, Williams' testimony at the bond hearing contained a rather devastating purported admission from petitioner (*i.e.* Mrs. Alhawarin).  In her June 2010 Statement, Williams said she told Mr. Alhawarin in October of 2009 that she no longer wanted to be a "part of it" and wanted a divorce.  Williams reported that, "a couple of weeks later," Mr. Alhawarin said that "the marriage was false . . . and he just wanted a green card and [she] could go on and live [her] life after he got his card."  CAR at 511.  When questioned about that statement at the bond hearing, Williams indicated that she was not in fact directly told that by Mr. Alhawarin, but actually it was Mrs. Alhawarin who texted that message to her.  Bond/Removal Tr. at 87.

In sum, the Court finds that: (1) the Agencies did consider the complete record that was before them; (2) the Plaintiffs did not establish that the transcripts from the bond hearings either

15

were actually before the Agencies or should have *sua sponte* been included by the Agencies in the record; and (3) the Plaintiffs have not shown that, if the transcripts of the bond hearing had been put before the Agencies, the Agencies would have concluded that Mr. Alhawarin's marriage to Williams was bona fide.

      C.  Whether the Agencies' Decisions Were Supported by Substantial Evidence

Plaintiffs challenge the Agencies' factual finding that Mr. Alhawarin's marriage to Williams was not bona fide. They bear the burden of showing that the Agencies' decision was not supported by "substantial evidence," which generally requires showing that the Agencies "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43.

The regulations require that USCIS "deny a petition for immigrant visa classification filed on behalf of any alien" if there is "substantial and probative evidence" that the beneficiary "has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 C.F.R. § 204.2(a)(1)(ii). There is a distinction between "substantial and probative evidence" which is a *standard of proof* that the Agencies must apply, and "substantial evidence" which is the *standard of review* that the Court must apply here in reviewing the Agencies' fact-finding. The "substantial and probative evidence" standard has not been defined very precisely, though the Ninth Circuit recently made clear that it requires at least a preponderance of the evidence. *See Zerezghi*, 955 F.3d at 814-16. In sum, the Court must determine whether "substantial evidence" supports a finding by the "substantial and probative evidence" standard that Mr. Alhawarin's previous marriage to Williams was not bona fide. In the I-130 petition context, under this "extremely deferential standard," agency findings must be affirmed "unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Dinh v. United States*, 670 F. Appx. 505, 506 (9th Cir. 2016).

The test for whether a marriage is bona fide is whether the couple "intended to establish a life together at the time they were married." *Nakamoto v. Ashcroft*, 363 F.3d 874, 882 (9th Cir. 2004). The Agencies determined that there was substantial and probative evidence that Mr. Alhawarin lacked that intent. In affirming USCIS' denial, the BIA *inter alia* relied on:

1.  Williams' June 2010 sworn declaration stating that "Mohammed clearly told me he needed

a green card to remain in this country. He told me he would help me if I helped him, but by then I realized the marriage was false and he was only tied to me for his green card."[24] CAR at 13-14; 511.

2. Webb's declaration stating, among other things, that: (1) Mr. Alhawarin never spent the night at the marital residence; (2) he and Williams would meet to prepare for the I-130 interview; and (3) Williams told Webb she was helping Mr. Alhawarin stay in the United States. *Id.* at 14, 514.

3. The "lack of evidence of a joint life between the beneficiary and his former spouse." *Id.* at 14.

The Agencies acknowledged Plaintiffs' allegations that Williams was purportedly coerced by federal agents into making the June 2010 Statement, and that the FBI had applied pressure on Mr. Alhawarin to be an informant in a separate FBI investigation. CAR at 3-4, 13-14. However, neither agency was satisfied that Plaintiffs had provided sufficient evidence of those claims to outweigh Williams' certification in the June 2010 Statement that it was "freely and voluntarily" made. The BIA found that "[t]he credibility of [the June 2010 Statement] is . . . enhanced, as the statement is self-incriminating, and the statements contained therein are similar to those made in the sworn statement of [Webb], which the [Plaintiffs] concede[] was not addressed by [Williams]'s updated declaration." CAR at 14. Plaintiffs argue that the December 2010 Statement should carry more weight because Williams "knew it was likely that if she testified and retracted the [June 2010 Statement] she could be prosecuted, yet she still chose to come forward." Alhawarin Opp. at 7; *see also* Alhawarin Reply at 15 ("By testifying and retracting her [June 2010 declaration] signed under duress and under threat of prosecution by the FBI, she was likely to be prosecuted, yet she still chose to come forward."). However, Plaintiffs do not state what Williams was opening herself to be prosecuted for. The Agencies determined that the argument did not cut in Plaintiffs' favor

---

[24] The Court notes that William's sworn statement consists primarily of three handwritten single-spaced pages describing in great detail her contacts and relationship with Mr. Alhawarin including dates, times, what was said, what was exchanged, conversations with third parties, etc. CAR at 510-12. Indeed, much of the contents of that statement include items which it would seem very unlikely to have been coerced. *See, e.g.,* CAR at 512:

> In October 2009 I got a call from Mike after I texted him and told him I wanted a divorce I was going to court to get paperwork. Mike told me he had a girlfriend and she treated him better than I did. He said she was amazing and her was going to bring her to his country and get married to her there. He told me he never wanted to be with me he never really loved me and he wasn't getting divorce papers until he got his green card.

because, as noted by the BIA, the June 2010 Statement was actually self-incriminating since in it Williams admitted to participating in marriage fraud.  If anything, it appears that the December 2010 Statement was self-serving since it denied the admission of wrongdoing or at least gave a supposed reason for the misfeasance (*i.e.* governmental coercion).

In their briefing, Plaintiffs cite testimony from the bond hearings – which are not part of the administrative record – that they claim make a prima facie case that Williams was coerced. The Court already denied Plaintiffs' motion to supplement the administrative record with the bond hearing transcripts, finding that the USCIS decision "addresse[d] Williams' allegations about harassment and coercion from the FBI and immigration authorities.  ECF No. 89 at 9.  However, even allowing review of the transcripts, Plaintiffs have not identified anything helpful to their case that was not already contained in either Williams' December 2010 Statement or the declaration by Plaintiffs' counsel, which were both in the administrative record.  *See* CAR at 47-55.  The declaration from Plaintiffs' counsel stated that:

> [T]his case stems from the fact that allegedly [Mr. Alhawarin]'s brother bumps up against a party of interest [to the FBI] and the reason [the FBI] went after this case specifically was to try to get Mr. Alhawarin to be an informant for the FBI.  While he agreed that he would turn over any evidence that he found suspicious, he did not want to work for FBI.  At which point, they arrested and detained him.

CAR at 55.  To support both the coercion and informant points, Plaintiffs cite to testimony in the transcript from the FBI agent who met with Williams in July 2010 that indicated he was part of the FBI's Joint Terrorism Task Force.  According to Plaintiffs, the fact that Williams was "questioned by the Joint Terrorism Task Force rather than an agency more appropriately tasked with investigating marriage fraud, supports a prima facie case that she was coerced by federal agents to provide the [June 2010 Statement] as this tactic was used by the FBI all over the US with regard to Muslims."  Alhawarin Reply at 15.  However, as noted in footnote 7, *supra,* FBI agents have been tasked with the authority to investigate immigration violations such as marriage fraud. Therefore, the fact that the FBI was involved in Mr. Alhawarin's case does not establish any *prima facie* proof of coercion.

Ultimately, the Court finds that Plaintiffs are asking it to substitute its judgment for that of the Agencies.  In their decisions, the Agencies acknowledged Plaintiffs' arguments that the June 2010 Statement was coerced by federal agents who sought Mr. Alhawarin as an informant.  The Agencies determined that Plaintiffs had not provided sufficient evidence of coercion to overcome Williams' declaration in the June 2010 Statement that it was made "freely and voluntarily."  That

statement, combined with the lack of evidence of a joint life (*e.g.* the short time between meeting and marriage, the inconsistent answers Mr. Alhawarin and Williams gave at the interview, the limited amount of time the two spent living together at the marital residence) and the affidavit from Webb,[25] provided sufficient and probative evidence that the marriage was not bona fide. Plaintiffs offer explanations for some of those items – *e.g.,* (1) that Mr. Alhawarin admittedly did not spend all his time living in the marital residence because he was working "20 hours a day seven days a week" in another town; and (2) that Murad wanted Mr. Alhawarin and Williams to marry quickly because, for religious reasons, he did not want his brother to engage in pre-marital sex. Alhawarin Reply at 6-7, 10. However, the Court's task in reviewing the Agencies' decisions for substantial evidence is not to weigh competing evidence, but rather is limited to determining if "the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Dinh*, 670 F. Appx. at 506.

In a case with somewhat similar facts to the present one, the court there found sufficient evidence to establish that the prior marriage was not bona fide. In *Manor v. Nielsen,* No. 3:18-cv-00522-AC, 2020 WL 4457824 (D. Or. July 6, 2020), plaintiff petitioner appealed the USCIS' denial of her I-130 petition for her Israeli citizen husband ("Manor") on the basis of her husband's prior marriage to Casey Brace who had previously submitted a petition on his behalf. After Brace's current and former boyfriends separately called a USCIS tip hotline claiming that Brace's marriage to Manor was fraudulent, Brace withdrew her petition and admitted that she married Manor solely to assist him in obtaining immigration benefits. The court eventually found that, even if one were to put aside Brace's admission of a fraudulent marriage, the USCIS still had identified specific and probative evidence of marriage fraud based upon the: (1) "scant evidence of courtship and no evidence that their wedding was celebrated by relatives and friends;" (2) "there is evidence that Manor and Brace did not cohabitate;" (3) "they attempted to deceive USCIS about their living arrangements;" and (4)  "there is minimal evidence that Manor and Brace co-mingled assets." *Id.* at *7.

Given the high level of deference an agency's decision is entitled to, the Court finds that there was sufficient evidence to support the Agencies' findings, under the "substantial and

---

[25] According to Webb, Mr. Alhawarin and Amber's marriage "was fake.  Amber received money, cars, cameras, for the marriage.  Amber and Mike would meet outside the Apartment to prepare for interviews.  Mike never spent the night or get dressed at the apartment.  Amber said she was helping Mike stay in the U.S."  CAR at 514.

probative evidence" standard, that Mr. Alhawarin's marriage to Williams was not bona fide.

    D.   <u>Whether Plaintiffs were Denied Due Process</u>

        *1.  Due Process under <u>Ching</u>*

Finally, Plaintiffs argue they were denied due process because they were not provided with an evidentiary hearing wherein they could have cross-examined Webb. *See Alhawarin MSJ* at 12, Alhawarin Reply at 16. However, there is no statutory right of cross-examination in the I-130 petition process. *See Ching v. Mayorkas*, 725 F.3d 1149, 1154 (9th Cir. 2013). Nevertheless, according to the ruling in *Ching*, due process *may* still require that a petitioner be given the opportunity to cross-examine an adverse witness. *Ching* is controlling precedent in the Ninth Circuit and this Court cannot ignored it or refuse to follow it absent "intervening higher authority." *See Flores v. Barr*, 930 F.3d 1082, 1088 (9th Cir. 2019). However, the Court sees a number of potential problems with the *Ching* decision.

As delineated in *Ching*, "the Due Process Clause of the Fifth Amendment provides that no person shall 'be deprived of life, liberty, or property, without due process of law' . . . . 'A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.'" *See* 725 F.3d at 1155. The Circuit went on to find such a protectible property interest in the I-130 petition process basing its holding on the following syllogism:

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Supreme Court "cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005). Instead, "[a] reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms." *Wedges/Ledges*, 24 F.3d at 62 (internal quotation marks omitted).

> Where a petitioner of an immediate relative petition proves that his marriage meets the requirements for the approval of an I-130, he is entitled, as a matter of right, to the approval of his petition. Section 204(b) of the INA provides that "After an investigation of the facts in each case, . . . the [Secretary of Homeland Security ("Secretary")] *shall*, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative[,] . . . *approve the petition* . . . ." 8 U.S.C. § 1154(b) (emphases added). The decision of whether to approve an I-130 visa petition is a nondiscretionary one because

> "determinations that 'require application of law to factual determinations' are nondiscretionary." *Hernandez v. Ashcroft*, 345 F.3d 824, 833-34 (9th Cir. 2003) (internal alteration omitted); *see also Garfias-Rodriguez v. Holder*, 702 F.3d 504, 525-26 n.16 (9th Cir. 2012) (en banc) (contrasting INA § 204(b)'s language with discretionary authority elsewhere in the INA); *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) (explaining that INA § 204(b)'s instruction that the Attorney General "shall . . . approve the petition" suggests that the provision is nondiscretionary).
>
> *Bustamante v. Mukasey*, 531 F.3d 1059 (9th Cir. 2008), buttresses this conclusion. There, a U.S. citizen wife challenged a consular official's denial of a visa petition for her husband, and the Court determined that "the denial of a visa implicates the constitutional rights of American citizens" because Bustamante "has a protected liberty interest in her marriage that gives rise to a right to constitutionally adequate procedures in the adjudication of her husband's visa application." 531 F.3d at 1061, 1062.

*See* 725 F.3d at 1155 (footnote omitted).

The first potential problem with the *Ching* analysis is its confusing the petitioner's liberty interest in marriage (and the concomitant right to live with one's spouse) with the requirements for (and the effect of) the approval of an I-130 petition. The latter do not affect the right to marry, nor does the Attorney General's determination (which is now exercised by the Secretary of Homeland Security though the USCIS) on the petition − especially when the beneficiary alien is already in the United States as Mr. Alhawarin is in the present case. The USCIS' and BIA's decision finding that Mr. Alhawarin's marriage to Williams was not bona fide does not adversely affect the bona fides of his marriage to Mrs. Alhawarin. It is still recognized for all purposes. Nor does the Agencies' adverse finding in regards to his former marriage automatically result in Mr. and Mrs. Alhawarin's being forced to separate. Rather, any such separation would occur only if removal proceedings are brought against Mr. Alhawarin. Moreover, in any such removal proceedings, the removable alien is accorded full due process rights including hearings and the opportunity to cross-examine witnesses. *See, e.g.*, *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001).

The second problem with the *Ching* analysis is its unsupported assumption that the granting of an I-130 petition provides either the petitioner or the alien beneficiary with actual and substantive rights or interests. The decision seems to assume that the grant of the petition confers permanent resident status; *it does not*. As previously observed, as to aliens already in the United States, the grant of an I-130 petition is merely the first step to getting an adjustment of status which would allow the alien beneficiary to remain in the United States. *See* footnote 3, *supra*. The filing or approval of an I-130 petition does not give the alien any immigration status or benefit. *See*

*https://www.uscis.gov/i-130* (last visited November 13, 2020).  Moreover, pursuant to 8 U.S.C. § 1255(a), even if the I-130 petition is initially approved, the Attorney General is given the authority to adjust the status of aliens, and that authority is entirely discretionary.  *See* 8 U.S.C. § 1255(a) ("The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence . . . .").[26]  Therefore, even if – as *Ching* opines – the decision of whether to approve an I-130 visa petition is a nondiscretionary one (because determinations that require application of law to factual determinations are nondiscretionary), it still does not constitute or create a liberty interest.

A third problem with *Ching* arises from the plurality decision in *Kerry v. Din*, 576 U.S. 86 (2015).  *Ching* stated that "[t]he right to marry and to enjoy marriage are unquestionably liberty interests protected by the Due Process Clause . . . . The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process.  [Citations omitted]."  However, a year and a half after *Ching*, the plurality opinion in *Kerry* throws the quoted portion of the *Ching* decision into question.  In *Kerry*, a U.S. citizen who successfully petitioned to have her Afghani husband classified as an "immediate relative" challenged the denial of visa by a consular officer who merely stated that her husband was barred under 8 U.S.C. § 1182(a)(3)(B) for engaging in unspecified "terrorist activities."  *Id.* at 89-90.  The Ninth Circuit found that the citizen petitioner and the alien beneficiary had a protected liberty interest in marriage that entitled them to limited judicial review of the denial of that visa request under the Due Process Clause.  *Id.* at 90.  The plurality opinion in *Kerry* disagreed stating that:

> [Petitioner] attempts to bring suit on his behalf, alleging that the Government's denial of her *husband's* visa application violated *her* constitutional rights . . . . In particular, she claims that the Government denied her due process of law when,

---

[26] As delineated in *Peng v. Gonzales*, No. C-06-07872-JCS, 2007 WL 2141270, at *1-2 (N.D. Cal. July 25, 2007):

> Although the text of section 1255 expressly authorizes the Attorney General to adjust status, that authority is now vested in the Secretary of Homeland Security by virtue of the Homeland Security Act of 2002, 6 U.S.C. §§ 101 et seq. 6 U.S.C. § 271(b) * * * * [T]he adjudication of adjustment of status applications [was] transferred to USCIS, a division of the newly created Department of Homeland Security. 6 U.S.C. § 271(b).  As a result of this transfer, the authority to adjudicate adjustment of status applications is now vested in the Director of USCIS. *Id.*; 8 C.F.R. § 245.2(a) (granting USCIS jurisdiction to adjudicate adjustment of status applications).

without adequate explanation of the reason for the visa denial, it deprived her of her constitutional right to live in the United States with her spouse.  There is no such constitutional right.

*Id.* at 88 (emphasis in original).  The other two justices (who joined in the judgment) did so finding that − without deciding whether the petitioner had a protected liberty interest but simply assuming that she did − the Government satisfied the due process requirements in that case when it merely provided the petitioner's husband with notice that his visa application was denied because he was inadmissible under 8 U.S.C. § 1182(a)(3)(B) which covers terrorist activities, even though it provided absolutely no further explanation.  *Id.* at 102.  Thus, there is a question as to the continued validity of the *Ching* decision following *Kerry*.[27]

Thus, given the above, one might conclude that the *Ching* decision is wrong in regards to the liberty interest arising from a determination as to the I-130 petition.  However, that conclusion is beyond this court's pay grade and hence it will now proceed with the analysis assuming the continued propriety of the holding in *Ching*.

2. *Due Process under* Mathews

Even assuming the presence of a protectable liberty interest, the analysis of what additional process is required in an administrative proceeding must be done on a case by case basis, and is guided by the three factors identified by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  *See Ching*, 725 F.3d at 1157.  As stated in *Mathews*:

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

As to the first factor, Plaintiffs rely on *Ching* wherein the Ninth Circuit held that an I-130 petitioner and his beneficiary spouse had a due process right to cross-examine the beneficiary's ex-husband based on the right to marry and to live with one's spouse.  *See* 725 F.3d at 1159 ("due

---

[27] Some courts have held the relevant holding in *Ching* still survives because the *Kerry* decision was simply a three-justice plurality.  *See, e.g., Ali v. United States*, No. 15-cv-201-AJ, 2016 U.S. Dist. LEXIS 73976, at *14-16 (D. N.H. June 17, 2016).  Further, the Ninth Circuit has recently cited the *Ching* holding in a published decision without raising any limitation or caution, although it did not reference the Supreme Court's holding in *Kerry* in doing so.  *See Zerezghi*, 955 F.3d at 808.

process required a hearing with an opportunity for Ching [the alien beneficiary] to confront the witnesses against her"). In the present situation, this Court has already delineated its conclusion that the private liberty interest is non-existent or, at best, minimal. However, for purposes of analysis in this section, the Court assumes that the interest is as important as the *Ching* court held. But even assuming *arguendo* for the *Mathews* analysis that there is a strong constitutional right for U.S. citizens to marry aliens and live with their spouses in the United States, it is unclear whether that private interest belongs only to the U.S. citizen or whether it also extends to the alien beneficiary for purposes of deciding the issue of due process procedures. For example, as stated in 8 C.F.R. § 103.2(a)(3) as to I-130 petitions, a "beneficiary of a petition is not a recognized party in such a proceeding." While in the end it may make no actual difference in most cases because the recognition of the petitioner's due process rights will cover the alien beneficiary's interests, still one should be careful in the analysis so as to avoid the impression of the existence of supposed rights where none are conferred.

As to the second *Mathews* factor (*i.e.* the risk of an erroneous deprivation of such interest through the procedures used), a number of cases within the Ninth Circuit have held that − where the USCIS does not rely *solely* on the statement of the ex-spouse as the basis for denying the I-130 petition – due process does not require that the petitioner be given the opportunity to cross-examine that ex-spouse. For example, in *Alabed v. Crawford*, 691 F. Appx. 430 (9th Cir. 2017), the plaintiffs sued the USCIS and BIA in regards to their finding that the non-citizen spouse's earlier marriage to Lourdes Murillo was fraudulent which precluded the granting of the current I-130 petition. As described in *Alabed*:

> Alabed and Murillo submitted very little documentation in support of their I 130 petition, and Alabed and Murillo gave inconsistent answers to certain questions during their interviews. When Murillo was confronted with these inconsistencies, she admitted the marriage was fraudulent and provided USCIS with a sworn statement attesting that Alabed had paid her to enter into the marriage. Moreover, USCIS obtained a police report in which Alabed mentioned his girlfriend, Gina Botello. Botello provided a sworn statement to USCIS indicating that she had been in a romantic relationship with Alabed since June 1998, prior to Alabed's marriage to Murillo. The romantic relationship between Alabed and Botello was confirmed by PG&E records showing that the two lived together from 1999 until 2000. This was substantial and probative evidence of marriage fraud. Appellants did not successfully rebut this evidence or establish that Alabed's marriage to Murillo was bona fide. The BIA reasonably determined that the new declarations from Botello and Murillo were not credible and that the declarations from friends and family were not inconsistent with a sham marriage.

*Id.* at 431-32.  The Circuit went on to hold that the plaintiffs did not have a due process right to cross-examine Botello, Murillo, or the USCIS officers who interviewed them − even under the *Ching* decision − stating that:

> Appellants rely on *Ching v. Mayorkas*, 725 F.3d 1149 (9th Cir. 2013), in which we held that an I-130 petitioner and his beneficiary spouse had a due process right to cross-examine the beneficiary spouse's ex-husband.  *Id.* at 1159.  But a case-specific analysis of the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), leads to a different result in this case.  In *Ching*, USCIS based its marriage fraud determination solely on a six-sentence statement from an ex-spouse, and the petitioners submitted compelling rebuttal evidence.  725 F.3d at 1158.  Here, by contrast, USCIS relied on evidence other than Murillo's sworn statement in making its marriage fraud determination, and Appellants' rebuttal evidence was less compelling.  The risk of erroneous deprivation is therefore far lower than it was in *Ching*.  Furthermore, Appellants had access to and submitted declarations from the very witnesses they wish to cross-examine.  It is therefore unlikely that cross-examination would significantly reduce the risk of erroneous deprivation.

*Id.* at 432.

Similarly, in *Singh v. Cissna*, No. 1:18-cv-00782-SKO, 2019 WL 3412324 (E.D. Cal. July 29, 2019), the plaintiffs brought an action challenging the denial of an I-130 petition on the basis of a fraudulent former marriage to Evelyn Williams involving the non-citizen husband Singh.  Again, there was a statement taken from Ms. Williams (wherein she said that her marriage to Singh was a fraud), which the plaintiffs attacked in part because they claimed Williams was subjected to improper interrogation techniques by USCIS agents.  The court found that the situation therein was "more analogous to *Alabed* than *Ching*" and found that "the risk of erroneous deprivation here is low."  *Id.* at *10.  In reaching that conclusion, the court observed that:

> Here, like in *Alabed*, USCIS relied upon far more than a single statement in denying the Petition, including (1) contradictory statements made by Ms. Williams and Plaintiff Singh during their interviews; (2) contradictory statements made by Plaintiff Singh during his October 8, 2002 interview and the August 9, 2017 interview in connection with the Petition; (3) a lack of supporting evidence establishing the bona fide nature of their marriage; (4) Plaintiff Singh's general lack of knowledge of Ms. Williams; (5) admissions by Ms. Williams that the marriage was fraudulent, made under oath and contemporaneously with her interview; (6) a sworn, written confession from Ms. Williams that the marriage was fraudulent; (7) Ms. Williams' affirmative withdrawal of her petition based upon her confession that the marriage between her and Plaintiff Singh was fake; and (8) the suspicious timing of the petition filed by Ms. Williams . . . .  Also, unlike in *Ching*, where Ching was "not informed of the circumstances under which [her ex-husband] was visited or his statement was taken," Plaintiffs were informed of the circumstances

25

> under which Ms. Williams' statement was taken, and her confession was video
> recorded, transcribed, and reduced to writing.

*Id.*

In the *Manor* case, described on page 19, *supra*, the plaintiffs claimed that their due process rights regarding the I-130 petition application were violated when they were not permitted to cross-examine Brace (the alien beneficiary's ex-spouse who withdrew her I-130 petition for him and who submitted a statement admitting her marriage to him was a fraud), and Brace's two boyfriends (Jeff Klingensmith and Christopher Pascall) who had called the USCIS tip hotline supplying information regarding the beneficiary's sham marriage to Brace.  *See* 2020 WL 4457824.  The court rejected that contention stating:

> Unlike *Ching*, USCIS did not rely solely on Brace's withdrawal of her I-130 and
> her statements during the March 4, 2010 interview.  As detailed above, USCIS and
> the BIA relied on other evidence in the file, including bank account statements, the
> inconsistent statements provided by Brace and Manor in interviews in 2008, the
> inconsistencies regarding their cohabitation, and lack of evidence about their
> courtship and wedding demonstrating that they intended to begin a life together at
> its inception.  And, unlike *Ching*, Plaintiffs' rebuttal evidence including affidavits
> from friends and Brace's relatives was not compelling.

*Id.* at *13.  *Ruhe v. Barr*, No. 2:18-cv-03734-AB-(AGRx), 2019 WL 4492953, at *7-8 (C.D. Cal. June 26, 2019), is another case which found that, even under *Ching*, due process did not require the plaintiffs to be given the opportunity to cross-examine the alien beneficiary's ex spouse.

This case is unlike *Ching* in that the denial of the I-130 petition was not premised on the single short statement of an ex-spouse.  As discussed above, the USCIS and BIA relied on other substantial evidence.  Further, unlike *Ching*, Plaintiffs were allowed to submit their own declaration from the ex-spouse (*i.e.* Williams) which the Agencies did review.  Further, had the Plaintiffs taken the opportunity to do so, they could have additionally provided the CD recordings of the bond hearings wherein Williams was questioned under oath.

Furthermore, the Plaintiffs' only complaint as to due process is the failure of having an opportunity to cross examine Webb.  However, they have not explained how they were denied an opportunity to obtain favorable evidence from Webb.  In its August 2013 NOID, the USCIS informed Plaintiffs that part of its decision to deny the I-130 petition was the October 25, 2010 interview with Williams' roommate (*i.e.* Webb) who "provided information regarding the fraudulent marriage arrangement between the ex-spouse and the beneficiary" including the facts that: "The witness stated that the ex-spouse received money, cars and cameras for the marriage.

They would meet outside the apartment to prepare for the interviews.  The beneficiary never spent the night at the apartment.  The ex-spouse admitted to the witness that she was helping beneficiary stay in the United States.  The ex-spouse was scared she would get caught. The ex-spouse did not want to be with the beneficiary – she just wanted the money." CAR at 9.  Consequently, Plaintiffs were apprised as to what Webb had told the USCIS.  Plaintiffs have not indicated any reason why they did not contact Webb themselves to get any evidence or information from her.  Additionally, while Plaintiffs argue that Webb's statement consisted almost exclusively of information which would be impossible for her to know first-hand, Plaintiffs have apparently forgotten that Webb was "Williams' roommate at the time."  *See* Def. SUF ¶ 31.   Much of what Webb stated is uncontroverted.  For example, Williams herself admits that Mr. Alhawarin paid $500 of the rent on Williams and Webb's apartment (with Webb paying the other $250), that Mr Alhawarin let Williams use his car and he paid for the insurance, etc.  Likewise, because Webb was living at the apartment with Williams, she would have obviously been aware of how often Mr. Alhawarin visited the premises.  Williams has never said that she refraind from ever talking with Webb.  Thus, the bases for Webb's statements are readily apparent.

In sum, consistent with the holdings in *Alabed*, *Singh*, *Manor* and *Ruhe*, the Court finds that the risk of erroneous deprivation herein is far lower than it was in *Ching* and that the Plaintiffs have not established the probable value of requiring that Webb be cross-examined by them when they have not indicated that they attempted to get evidence from her by way of asking her to submit another statement such as the one Williams supplied to them.

Turning to the third *Mathews* factor (*i.e.* the Government's interest and the fiscal/administrative burdens that the additional or substitute procedural requirements would entail), one must first consider the current procedures delineated for I-130 process itself.  Normally, there is no statutory or regulatory duty to conduct evidentiary hearings in I-130 petition situations.  *See Ruhe*, 2019 WL 4492953, at *8 (observing that the USCIS "ha[s] no statutory or regulatory duty to conduct evidentiary hearings in Form I-130 cases").  The petitioner submits the application plus concomitant documents and evidentiary submissions in writing (as set out in the instructions on the agency form) to the Department of Homeland Security.  *See* 8 C.F.R. § 103.2(a)(1), (b)(1).  Upon receipt of the petition and other documents, the USCIS may require the taking of testimony, and may direct any necessary investigation; but that taking of testimony appears to be in the form of sworn affidavits and not live testimony at a hearing.  *See* 8 C.F.R. § 103.2(b)(7).

27

If the evidence received along with the petition establishes eligibility, the USCIS will approve the benefit request, "except that in any case in which the applicable statute or regulation makes the approval of a benefit request a matter entrusted to USCIS discretion, USCIS will approve the benefit request only if the evidence of record establishes both eligibility and that the petitioner or applicant warrants a favorable exercise of discretion." *See* 8 C.F.R. § 103.2(b)(8)(i). On the other hand, if the submitted materials show ineligibility, the petition will be denied. *Id.* If all required initial evidence does not demonstrate eligibility, the USCIS in its discretion may deny the application or may request additional evidence. *Id.* at § 103.2(b)(8)(ii).

If the USCIS intends to deny the petition, it must give the petitioner a written "notice of intent to deny" which must provide the petitioner with (1) adequate notice, (2) sufficient information upon which to respond, and (3) a deadline for the response which may not exceed twelve weeks. *Id.* at § 103.2(b)(8)(iv). The petitioner "shall be permitted to inspect the record of the proceeding which constitutes the basis for the decision" except those portions which are based on classified information. *Id.* at § 103.2(b)(16). If the decision to deny the application "is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered, except as provided in paragraphs (b)(16)(ii), (iii), and (iv) of this section [which relates to classified information]. Any explanation, rebuttal, or information presented by or in behalf of the applicant or petitioner shall be included in the record of proceeding." *Id.* at § 103.2(b)(16)(i).

"When a Service officer denies an application of petition filed under § 103.2 . . . , the officer shall explain in writing the specific reasons for denial." *Id.* at § 103.3(a)(1)(i). Where the denial is appealable, the officer must state the appellate jurisdiction and furnish the appropriate appeal form. *Id.* at § 103.3(a)(1)(iii).

In sum, the I-130 petition process does not normally involve hearings or the taking of live testimony with a concomitant opportunity to cross-examine witnesses. Additionally, it has been held that "[t]he strict rules of evidence governing the admissibility of hearsay in judicial proceedings are not applicable to administrative hearings." *See Marlowe v. U.S. Immigration and Naturalization Service*, 457 F.2d 1314, 1315 (9th Cir. 1972) (*per curiam*). The mere fact that an immigration judge considers a sworn written statement that contains hearsay without allowing the alien petitioner to cross-examine the declarant does not automatically give rise to a due process

deprivation.  *See Villegas-Valenzuela v. INS*, 103 F.3d 805, 812 (9th Cir. 1996).

If Plaintiffs are attempting to contend that the USCIS was obligated to produce Webb at some hearing before being allowed to consider her sworn statement, that proposed procedural requirement would strongly impact the third *Mathews* factor as to the Government's interest, including the function involved and the fiscal and administrative burdens.  In *Ching*, USCIS based its marriage fraud determination solely on a six-sentence statement from an ex-spouse during the course of the current I-130 petition, and the petitioner submitted compelling rebuttal evidence.[28] Here, however, the Agencies did not rely solely or even primarily on Webb's statement.  Instead, the Agencies relied heavily on Williams's June 2010 Statement, which is the biggest obstacle facing Plaintiffs.  Plaintiffs suggest that a cross-examination of Webb would rebut Webb's claims that "[Williams] received money, cars, cameras, for the marriage" and that "[Mr. Alhawarin] never spent the night or got dressed at the [marital residence]."[29]  Alhawarin MSJ at 7-8.  However, they have not offered *any* theory for how it would bolster their argument that the June 2010 Statement was coerced.  *See, e.g.*, *Dhillon v. Mayorkas*, 537 F. Appx. 737 (9th Cir. 2013) (finding that the process afforded as to I-130 petitions was adequate because appellants had not provided "any theory under which the cross examination they seek would have enhanced or altered the adjudication of [appellants'] petition").  As noted earlier, while the BIA did rely in part on Webb's statement for corroborating Williams' June 2010 Statement, the BIA also found the June 2010 Statement more credible based on the fact that it was self-incriminating (whereas Plaintiffs have not identified how the December 2010 Statement is self-incriminating as opposed to self-serving).

Applying the "case-specific" analysis of the factors set forth in *Mathews* in the present matter leads to a very different result in this litigation as opposed to the result in *Ching*.  *See Alabed*, 691 F. Appx. at 432.  As a result, the Court finds that Plaintiffs' due process rights were

---

[28] The Circuit in *Ching* described the ex-spouse's statement as consisting of six short sentences whereas the beneficiary submitted "a three-page, single-spaced, 21-paragraph sworn declaration . . . describing in excruciating detail her intimate relationship with [the ex-spouse]."  *See* 725 F.3d at 1153.  Further, the Circuit stated that "In this case, it is not possible to determine that [the ex-spouse's] statement is true and that Ching's is false solely by reading them.  In addition, Ching presented substantial and − at this stage − uncontested documentary evidence to corroborate her claim that the marriage was bona fide.  Therefore, under the specific circumstances of this case, due process required a hearing with an opportunity for Ching to confront the witnesses against her."  *Id.* at 1159.

[29] Plaintiffs argue that this is directly contradicted by Williams's later testimony at the bond hearings that "Mr. Alhawarin would come to the home 2-3 times a week in the evening to hang out and spend time together," but that testimony does not indicate that he stayed *overnight* at the residence.  Moreover, the cited testimony was preceded by Williams' emphatic and repeated assertions that she and Mr. Alhawarin *never* lived together.  Williams in her testimony also admitted receiving monthly rent money, the use of Mr. Alhawarin's car, his payment of insurance, etc.

not violated herein in regards to the Agencies' consideration of Webb's statement under oath without concomitantly requiring the USCIS to conduct a formal hearing wherein Plaintiffs would have been allowed to cross-examine Webb.[30]

## IV. Conclusion

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment. Defendants are to prepare a proposed judgment forthwith.

---

[30] It is not established in the record whether Webb was locatable and available to be cross-examined in or after August of 2013 (when the USCIS issued its NOID as to Mrs. Alhawarin's I-130 petition). Webb executed her statement in October of 2010.